1
2
3
4
5          UNITED STATES DISTRICT COURT
6          NORTHERN DISTRICT OF CALIFORNIA
7
8    MARCUS L. HARRISON,                        No. C 09-4665 SI (pr)
9              Plaintiff,                        **ORDER GRANTING IN PART AND
                                                 DENYING IN PART DEFENDANTS'
10        v.                                     MOTION FOR SUMMARY
                                                 JUDGMENT AND DENYING
11   D.E. MILLIGAN, et al.,                      PLAINTIFF'S REQUEST FOR
                                                 JUDICIAL NOTICE**
12             Defendants.
13
     _____/           Doc. ## 14, 16
14
15                              **INTRODUCTION**

16        Marcus L. Harrison, an inmate at Pelican Bay State Prison ("PBSP"), filed a pro se civil

17   rights action under 42 U.S.C. § 1983, asserting a First Amendment claim regarding the

18   confiscation of certain outgoing and incoming mail.  Defendants moved for summary judgment

19   and plaintiff opposed the motion.  For the reasons discussed below, defendants' motion for

20   summary judgment (Doc. #14) is GRANTED IN PART and DENIED IN PART.

21

22                              **BACKGROUND**

23        Harrison alleged in his complaint that PBSP officials violated his First Amendment rights

24   by wrongfully confiscating his incoming and outgoing mail.  Defendants contend that the

25   confiscations were permissible because the materials illegally promoted gang activity.

26   Defendants also contend that some of the mails violated prison prohibitions on inmate-to-inmate

27   correspondence and revenue generation.  Harrison denies that his mail violated any prison

28   regulations.  He claims that his mail "was only promoting education, political, social, and

**United States District Court**
For the Northern District of California

cultural awareness from the viewpoints of the New Afrikan." Doc. #15 at 4. Defendants also claim that they are entitled to qualified immunity.

The following facts are undisputed unless otherwise noted.

Harrison has been validated as a member of the Black Guerilla Family prison gang ("BGF"). As a result of his validation, he is housed in the security housing unit ("SHU") at Pelican Bay. One of the reasons gang members are housed in the SHU is to monitor and intercept their illegal communications. Doc. #1, Exh. A at 86.

1. The Black Guerilla Family and George Jackson

The BGF is a recognized prison gang. The BGF has incorporated George Jackson's ideologies into their beliefs. Id. at 45. The BGF has adopted the Black Panthers, George Jackson and other revolutionary figures for their own use. Id. at 31. In order to promote BGF ideologies, BGF members circulate pamphlets which discuss the Black Panthers and encourage revolution by people of African descent to liberate themselves from an oppressive government. Id.

BGF members refer to themselves as "New Afrikans." Id. at 83. The reference to African Americans as "New Afrikans" is not a title accepted in mainstream society. Id. This title is derived from the Republic of New Afrika, a 1968 revolutionary organization which sought the establishment of an independent black-majority nation in the Southern United States (excluding Florida). This group had violent confrontations with law enforcement as it attempted to accomplish its goals. Id. at 83. The New Afrikan Revolutionary Nationalist ("NARN") organization also derives from the Republic of New Afrika. The California Department of Corrections ("CDCR") has determined that the NARN organization is a disguise for the activities of the BGF. Id. at 68. In a pamphlet published by the New Afrikan Peoples Organization, the New Afrikan Liberation struggle is described as "the struggle of Black prisoners, 'behind the walls' of U.S. penal institutions, to gain liberation for ourselves, our people, and all oppressed people." Doc. #15, Exh. B.

Harrison claims that the title "New Afrikan" is used by "all black people, as it is a part of the historical materialism and culture of all people, and not solely used by the BGF." Doc. #1, Exh. A at 77. Harrison further argues that NARN is simply an ideology and not a BGF reference. Id. at 61.

2.    Regulations Related to Prison Gangs and Inmate Mail

The California Code of Regulations defines a "gang" as any group whose members engage in unlawful acts or acts of misconduct. 15 Cal. Code Regs. § 3000. "Prison gang" is defined as any gang with its roots or origins within the CDCR or any other prison system. Id. Prison gangs "present a serious threat to the safety and security of California prisons." Id. at § 3023(b). "Inmates . . . shall not knowingly promote, further or assist any gang . . ." Id. at § 3023(a).

The regulations prohibit mailing gang-related materials and other contraband. Id. at §§ 3006, 3136. Any material reasonably deemed to be a threat to a legitimate penological interest is classified as contraband. Id. at § 3006(c)(16). If prison staff determine that an inmate's incoming or outgoing mail has any of the characteristics of contraband, as listed in Section 3006(c), the regulations require that prison staff confiscate the suspect mail. Id. at § 3136(a). In addition, prison regulations prohibit inmate-to-inmate correspondence, id. at § 3139(1), and inmate mail which directs revenue-generating activity. Id. at § 3024(b).

**VENUE AND JURISDICTION**

Venue is proper in the Northern District of California because the events or omissions giving rise to the claims occurred at Pelican Bay State Prison in Del Norte County, which is located within the Northern District. See 28 U.S.C. §§ 84, 1391(b). This court has federal question jurisdiction over this action brought under 42 U.S.C. § 1983. See 28 U.S.C. § 1331.

United States District Court
For the Northern District of California

## LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment is proper where the pleadings, discovery and affidavits show that there is "no genuine issue as to any material fact and [that] the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  A court will grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  A fact is material if it might affect the outcome of the lawsuit under governing law, and a dispute about such a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

Generally, when a party challenges the merits of the opponent's claim, the moving party bears the initial burden of identifying those portions of the record which demonstrate the absence of a genuine issue of material fact.  The burden then shifts to the nonmoving party to "go beyond the pleadings, and by his own affidavits, or by the 'depositions, answers to interrogatories, or admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Celotex, 477 U.S. at 324 (citations omitted).

A verified complaint may be used as an opposing affidavit under Rule 56, as long as it is based on personal knowledge and sets forth specific facts admissible in evidence. Schroeder v. McDonald, 55 F.3d 454, 460 & nn.10-11 (9th Cir. 1995) (treating plaintiff's verified complaint as opposing affidavit where, even though verification not in conformity with 28 U.S.C. § 1746, plaintiff stated under penalty of perjury that contents were true and correct, and allegations were not based purely on his belief but on his personal knowledge).  The complaint was made under penalty of perjury and therefore is considered as evidence.

The court's function on a summary judgment motion is not to make credibility determinations or weigh conflicting evidence with respect to a disputed material fact. See T.W.

Elec. Serv. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987). The evidence must be viewed in the light most favorable to the nonmoving party, and inferences to be drawn from the facts must be viewed in a light most favorable to the nonmoving party. Id. at 631.

**DISCUSSION**

"Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." Pell v. Procunier, 417 U.S. 817, 822 (1974) (citing Price v. Johnston, 334 U.S. 266, 285 (1948)). Prisoners retain those First Amendment rights not inconsistent with their status as prison inmates or with legitimate penological objectives of the corrections system. Id. In evaluating a mail confiscation claim, the court applies two slightly different tests – the test used for restrictions on outgoing mail is slightly more difficult for prison officials than the test used for restrictions on incoming mail.

As to incoming mail, a regulation or practice limiting prisoners' receipt of mail is valid if it is reasonably related to legitimate penological interests. Thornburgh v. Abbott, 490 U.S. 401, 413 (1989) (citing Turner v. Safley, 482 U.S. 78, 89 (1987)); see also Crofton v. Roe, 170 F.3d 957, 959 (9th Cir. 1999). Four factors are to be considered when determining the reasonableness of a prison rule: (1) whether there is a "valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it," (2) "whether there are alternative means of exercising the right that remain open to prison inmates," (3) "the impact accommodation of the asserted constitutional right will have on guards and other inmates and on the allocation of prison resources generally," and (4) the "absence of ready alternatives," or, in other words, whether the rule at issue is an "exaggerated response to prison concerns." Turner, 482 U.S. at 89-90.

Prison officials are not required to show with certainty that any particular correspondence would have adverse consequences because prison administrators are given some latitude in anticipating the probable consequences of allowing a certain speech in and out of a prison

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

environment.  Procunier v. Martinez, 416 U.S. 396, 412 (1974), overruled on other grounds by Thornburgh, 490 U.S. at 413-14.   Courts owe "substantial deference to the professional judgment of prison administrators."  Overton v. Bazzetta, 539 U.S. 126, 132 (2003).

However, in the case of outgoing mail, an exception to the Turner standard applies.  See, e.g., Thornburgh, 490 U.S. at 411 ("outgoing personal correspondence from prisoners . . . [does] not, by its very nature, pose a serious threat to prison order and security.").  A limitation on outgoing mail is justified only if the limitation in question (1) "furthers an important governmental interest unrelated to the suppression of expression," and (2) is "no greater than necessary or essential" to protect the governmental interest involved.  Procunier, 416 U.S. at 413; Barrett v. Belleque, 544 F.3d 1060, 1062 (9th Cir. 2008).   Procunier is not a "least restrictive means" test; rather the challenged prison action must be "generally necessary" to a legitimate governmental interest.  Procunier, 416 U.S. at 411.

Because Harrison alleges that both his outgoing and incoming mail were confiscated by defendants, both tests will be used.  That is, Turner will be applied to the incoming mail, and Procunier v. Martinez will be applied to the outgoing mail.

1.    Incoming Mail

    A.    Background

Harrison argues that defendants violated his First Amendment rights when they confiscated the following six pieces of incoming mail:[1]

    (1)    On November 26, 2007, Harrison's incoming mail from Anthony Rayson was confiscated by Institutional Gang Investigations ("IGI") Officer D. Milligan and Investigative Services Unit ("ISU") Captain K. Brandon because it was allegedly gang-related

---

[1]The court's ability to evaluate the merits of this case is hampered by the fact that none of the incoming mail at issue has been entered into the record. Even if Harrison is prohibited from seeing the confiscated mails, defendants had the option of filing the documents under seal. Harrison provides an affidavit from Hannah Bastienne which describes the contents of the mail she sent to Harrison in July 2008.  Doc. #15, Exh. D.  Therefore, in conducting its analysis, the court relies on the parties' description of the documents and Bastiene's affidavit.

United States District Court
For the Northern District of California

material and an unauthorized third-party correspondence.  Doc. #1, Exh. A at 15.  The mail discussed George Jackson publications.  After a second level review, Harrison's mail was delivered to him because it was determined that his mail did not contain gang-related material and was not a third-party correspondence.  Since Harrison received his mail, there is no First Amendment violation with respect to this piece of mail.  Id. at 17.

(2) On March 19, 2008, two pieces of Harrison's incoming mail were confiscated by Officer Milligan and Captain Brandon because they allegedly promoted gang activity.  Id. at 27-28.  The first piece of mail was from S. Chicago ABC Zine Distro Publisher/Distribution ("S. Chicago ABC Zine") and contained a pamphlet titled "George Jackson Lives, Vol. #4."  The pamphlet consisted of articles authored by Harrison and Hugo L.A. Pinell, an inmate who is a validated BGF associate.  The stopped mail notice also stated that the mail violated prison prohibitions on using fictitious names or addresses, and circumventing mail procedures.  Id. at 27.  The second piece of mail was from Anthony Rayson and had a two-page handwritten letter which discussed sending Harrison a copy of the above pamphlet.

Harrison appealed the confiscation, arguing that since George Jackson was not a BGF member, the mail was not BGF-related.  Id. at 23-24.  At the second level review of his appeal, prison officials found that the letters did not use a fictitious name or address, but that they did promote gang activity:

> The articles [in the pamphlet] advocate the ideologies of the Black Panther and BGF of revolution by people of African decent [sic] to liberate themselves from the oppressive government controls.  The pamphlet is also embedded with iconic symbols of the Black Panther, George Jackson, and several other revolutionary figures used by the BGF to arouse the reader to the ideologies of the BGF. . . .

> BGF members use these pamphlets to circulate information to inmates in the prisons in an effort to promote the ideologies of the BGF. . . .

> Both mail stops requested by Officer Milligan indicate that the mail promotes gang activity. This information is correct.  The information that the author is using a fictitious name from a single address is partially correct.  However, Anthony Rayson used his business address and his position as editor of the pamphlets to mail personal letters to Harrison that contain gang information. . . .

> Harrison's argument that the mere mention of the name of George Jackson does not constitute BGF activity is noted.  The Second Level Reviewer would agree with this

argument if the letter merely mentioned the name of George Jackson. In this instance the enclosed pamphlet is titled "George Jackson Lives." This is a strong inflammatory statement of the revolutionary ideals of the BGF and a title that is intended to evoke the reader.

Id. at 31-32.

Harrison appealed again and received a director level review. The director denied his appeal, finding that the Harrison received a careful review of the issues, and that the denial at his second level review was "based upon a reasonable penological interest." Id. at 34.

(3)     On April 9, 2008, Harrison's incoming mail from "Books Through Bars" was confiscated by Officer Milligan and Captain Brandon because it allegedly promoted gang activity by discussing George Jackson literature. Id. at 43. The mailing described how to obtain George Jackson literature. Id. at 45.

Harrison appealed the confiscation, again arguing that the mere discussion of George Jackson did not constitute promoting BGF activity. Id. at 36, 38-39. Harrison's appeal went directly to a second level review by Warden Horel. Horel denied Harrison's request to receive the confiscated mailing:

> This mailing is being held in IGI pending further investigation into the BGF gang activity as it tells the reader where they can obtain George Jackson books, which constitutes promoting gang activity. Even though George Jackson was never a BGF gang member, the BGF gang has patterned their gang's beliefs to incorporate George Jackson's ideology and beliefs and therefore, offering to inform the reader of where to obtain these books falls under promoting gang activity.

Id. at 45.

Harrison appealed again and received a director level review. The director denied his appeal, finding that the mail promoted gang activity and noting that the CDCR has deemed writings from George Jackson as gang-related in accordance with the Office of Correctional Safety. Id. at 47.

(4)     On July 14, 2008, two pieces of Harrison's incoming mail were confiscated by Officer Milligan and Captain Brandon because they allegedly promoted gang activity. Id. at 51-52.

The first piece of mail had a return address of Hannah Bastienne, 1728 Berkeley Way #4, Berkeley CA 94703. The record is unclear as to what is discussed in the Bastienne mail. According to prison officials, the mail was gang-related because it discussed a BGF event. Id. at 51, 53. At summary judgment, defendants also claimed that the Bastienne letter constituted inmate participation in unauthorized revenue generating activity because it was a fundraiser. Harrison claims that the event was a fundraiser for NARN and not BGF-related. Doc. #15 at 10. On the other hand, Bastienne claims that the mail discussed a community event organized to generate support for Harrison's September 2008 parole hearing and to raise money to pay for Harrison's yearly care package. Id. at Exh. D.

The second piece of mail had a return address of Neilson Gonzalez, 1240 Walton Ave. #314, Bronx NY 10452. The contents of the mailing were not described; nor was this mail entered into the record. Prison officials stated that the Gonzalez letter also violated the prohibition on unauthorized inmate-to-inmate correspondence from another institution: "Upon review, it was determined that the letter did, in fact, contain information that promotes gang activities and contained inmate to inmate correspondence from another institution. The information originated from another institution but was not mailed directly from that institution." Doc. #1, Exh. A at 52.

B.    Analysis

Prison staff are not permitted to allow "inmate[s] to send or receive mail which, in their judgment, has any of the characteristics listed in section 3006(c)", including materials reasonably deemed to be a threat to legitimate penological order. Id. at § 3136. In Harrison's case, his mail was confiscated primarily because it promoted gang activity in violation of Section 3136. Some of the mail also violated additional prison regulations. The Gonzalez letter stopped on July 14, 2008 was considered unauthorized inmate-to-inmate correspondence, in violation of Section 3139(1). The Bastienne letter stopped on July 14, 2008 was considered mail regarding unauthorized revenue generation. In essence, Harrison is challenging prison regulations

9

prohibiting the following types of mail, as applied to his mail: (1) mail promoting gang activity, and specifically mail referring to George Jackson; (2) unauthorized inmate-to-inmate correspondence; and (3) mail directing revenue-generating activity.

In evaluating whether the prison's regulations regarding incoming mail are reasonably related to legitimate penological interests, the Court applies the <u>Turner</u> factors. The task in considering the <u>Turner</u> factors is to determine whether the state shows a reasonable relation between the policy and legitimate penological objectives. <u>Beard v. Banks</u>, 548 U.S. 521, 527 (2006). While all justifiable inferences must be drawn in the prisoner's favor with respect to matters of disputed fact, in disputed matters of professional judgment the court's inferences must accord deference to the views of prison authorities. <u>See id.</u> at 526. Unless a prisoner can point to evidence showing the policy is not reasonably related to legitimate penological objectives, sufficient to allow him to prevail on the merits, he cannot prevail at the summary judgment stage. <u>Id.</u>

According to prison officials, the above restrictions on incoming mail are necessary to ensure prison security. Prison security is a legitimate and neutral penological interest. <u>Stefanow v. McFadden</u>, 103 F.3d 1466, 1472 (1996) (recognizing prison security as a legitimate and "compelling" penological interest and upholding content-based confiscation of book advocating racism and violence); <u>see also</u> <u>Farmer v. Brennan</u>, 511 U.S. 825, 833 (1994). Prison gangs in particular are a threat to inmate and staff safety, as well as to prison order. <u>See, e.g.</u>, <u>Wilkinson v. Austin</u>, 545 U.S. 209, 227 (2005); <u>Westefer v. Snyder</u>, 422 F.3d 570, 575 (7th Cir. 2005). The Court applies the <u>Turner</u> analysis to each of the challenged regulations.

       I     <u>Prohibition Against Mail Which Promotes Gang Activity By Referencing George Jackson</u>. With respect to the first <u>Turner</u> factor, the initial burden is on defendants to put forth a "common-sense" connection between their policy and a legitimate penological interest. <u>See</u> <u>Frost v. Symington</u>, 197 F.3d 348, 357 (9th Cir. 1999). If defendants do so, plaintiff must present evidence that refutes the connection. <u>Id.</u> Defendants must then present enough

10

counter-evidence to show that the connection is not "so remote as to render the policy arbitrary or irrational." Id.

The Court first evaluates whether defendants have met their burden under the first Turner factor with respect to each piece of mail before proceeding to the remainder of the Turner analysis.

**Mail stopped on March 19, 2008.** The mails stopped on March 19, 2008, contained articles authored by Harrison and by another inmate, Hugo L. Pinell, who is also a validated associate of the BGF. The mails were sent from Anthony Rayson and his publishing company, S. Chicago ABC Zine. Rayson's organization has previously published gang-related materials for BGF members housed at PBSP-SHU. The BGF has incorporated George Jackson's teachings into its ideology. At the second level review, Warden Horel noted that BGF members used these pamphlets to circulate information to other inmates and promote BGF ideology. Horel also found that the title of the pamphlet, "George Jackson Lives," was a strong inflammatory statement. Given this context, the prison regulation requiring confiscation of gang-related mail, Cal. Code Regs., tit. 15, § 3136(a), is reasonably related to prison security, and was reasonably applied to the George Jackson-related mail stopped on March 19, 2008.

**Mail Stopped on April 9, 2008.** According to the record, the mail stopped on April 9, 2008 describes how to obtain George Jackson literature. The prison officials claim the confiscation is necessary because "[e]ven though George Jackson was never a BGF gang member, the BGF gang has patterned their gang's beliefs to incorporate George Jackson's ideology and beliefs and therefore, offering to inform the reader of where to obtain these books falls under promoting gang activity." Doc. #1, Exh. A at 45.

It appears that this mail promotes gang activity only because George Jackson is mentioned; there is no indication that the mail discusses George Jackson's ideology and beliefs.[2]

---

[2]Even if prisoners do order George Jackson literature per the instructions provided in this mail, prison officials can confiscate the George Jackson literature if they find the literature promotes gang activity.

United States District Court
For the Northern District of California

By contrast with the mail stopped on March 19, 2008, in which validated gang members invoked George Jackson in an inflammatory context, this mail apparently only describes how to obtain literature concerning George Jackson.

If the regulation prohibiting gang-related mail is expanded to justify confiscation of any mail which simply mentions George Jackson, it is no longer clear that it satisfies the "common sense" Turner test. The defendants have failed to demonstrate the absence of a genuine issue of material fact as to whether this piece of mail promotes gang activity. Celotex, 477 U.S. at 323. Nor have defendants presented sufficient evidence indicating that prison security requires confiscating mail that has any mention of George Jackson.

**Mail Stopped on July 14, 2008**. Similarly, the record does not show how the mail stopped on July 14, 2008 promotes gang activity.

The first piece of mail confiscated on July 14, 2008 was a letter from a non-inmate, Hannah Bastienne, who has no gang affiliation, describing an event. In reviewing Harrison's appeal, prison officials concluded, without providing any detail: "Upon review it was determined that the letter did, in fact, contain information that promotes gang activities and contained information pertaining to a Black Guerilla Family function." Doc. #1, Exh. A at 53.

The letter itself is not in the record, and the discussions of it contain conflicting descriptions. Harrison describes the event as a "community fundraiser" which has the "sole purpose . . .[of raising] funds for the New Afrikan Community Response Network, in particular, as it pertains to their community based political work." Doc. #15 at 10. However, he also provides an affidavit from Bastienne wherein she states that the purpose of the community event was to raise awareness about Harrison's upcoming parole hearing and to raise funds to pay for Harrison's yearly care package. Id. at Exh. D. If Bastienne's letter discussed a NARN fundraiser, the Court must defer to prison officials' professional judgment about the relationship between the New Afrikan Community Response Network and the BGF. Beard, 548 U.S. at 526. However, if the event was merely to raise awareness about Harrison's parole hearing and raise funds for a yearly care package, defendants have failed to provide sufficient evidence to link the

United States District Court
For the Northern District of California

1  event to prison security or gang activity.  Since all justifiable inferences must be drawn in the

2  prisoner's favor with respect to matters of disputed fact, id., the Court finds that a factual dispute

3  remains as to whether Bastienne's letter promotes gang activity.

4          The second piece of mail confiscated on July 14, 2008 was a letter from Nielson

5  Gonzalez.  Prison officials again concluded that the letter promoted gang activity without

6  providing any details.  Harrison argues that there is no evidence supporting the prison officials'

7  conclusion.  In denying Harrison's appeal, the second level reviewer and the Warden do not

8  explain how the letter promotes gang activity.  Defendants do not provide the court with a copy

9  of the Gonzalez letter, even under seal.  Based on the record before the Court, a factual dispute

10  remains as to whether the Gonzalez letter promotes gang activity.

11          The defendants have satisfied their burden for the first Turner factor for the mails stopped

12  on March 19, 2008.  Because defendants have not shown a connection between prison security

13  and confiscation of Harrison's mail on April 9, 2008, and July 14, 2008, the Court only considers

14  the remaining Turner factors with respect to the mail stopped on March 19, 2008.  See, e.g.,

15  Hrdlicka v. Reniff, 631 F.3d 1044, 1051 (9th Cir. 2011) ("'[I]f the prison fails to show that the

16  regulation is rationally related to a legitimate penological objective, we do not consider the other

17  factors.'") (quoting Ashker v. Cal. Dep't of Corr., 350 F.3d 917, 922 (9th Cir. 2003).

18          The second Turner factor is satisfied where "there are alternative means of exercising the

19  [constitutional] right that remain open to prison inmates." Turner, 482 U.S. at 89-90.  Harrison's

20  goal is to exercise his First Amendment rights to express his political beliefs.  Doc. #1, at 2.

21  There is no indication that Harrison has been prohibited from all political speech.  His political

22  speech has been limited only insofar as prison officials determine that, in their professional

23  judgment, his speech promotes gang activity.  See e.g., Banks, 548 U.S. at 516 (in disputed

24  matters of professional judgment the court's inferences must accord deference to the views of

25  prison authorities).

26          As to the third Turner factor, were prison authorities to "accommodat[e] . . . the asserted

27  constitutional right," the resulting "impact" would be negative because the BGF could share their

28

13

1   ideology to recruit new members or further indoctrinate existing members, thereby endangering

2   the safety and security of inmates and staff. <u>Turner</u>, 482 U.S. at 91.

3          The fourth <u>Turner</u> factor requires the Court to consider whether there is a ready

4   alternative to the confiscation that "fully accommodates the prisoner's rights at de minimis cost

5   to valid penological interests." <u>Turner</u>, 482 U.S. at 91 (citations omitted).  An absence of ready

6   alternatives to the confiscation is "evidence of the reasonableness of the regulation." <u>Id.</u>  The

7   burden is on the prisoner challenging the regulation, not on the prison officials, to show that

8   there are obvious, easy alternatives to the regulation. <u>See</u> <u>O'Lone v. Estate of Shabazz</u>, 482 U.S.

9   342, 350 (1987); <u>see also</u> <u>Mauro v. Arpaio</u>, 188 F.3d 1054, 1063 (9th Cir. 1999) (finding in favor

10  of defendants on fourth <u>Turner</u> factor where plaintiff failed to point to alternative that

11  accommodated his rights at de minimis cost to security interests).

12  Plaintiff has not put forth a ready alternative that would be a de minimis cost to prison security

13  and internal order and discipline.  Accordingly, the Court finds defendants have satisfied the

14  fourth element of the <u>Turner</u> test.

15         With respect to the prohibition against mail promoting gang activity, the Court finds that

16  defendants have met their burden under the <u>Turner</u> test for the mail stopped on March 19, 2008.

17  However, viewing the facts in the light most favorable to Harrison, the Court finds that the

18  record is unclear as to whether the mails stopped on April 9, 2008, and July 14, 2008, promoted

19  gang activity.

20

21         ii.    <u>Prohibition Against Inmate-to-Inmate Correspondence From Different</u>

22  <u>Institutions</u>.  Harrison does not challenge the reasonableness of the prohibition on inmate-to-

23  inmate correspondence from other institutions.  Instead, he argues that the Gonzalez letter is not

24  prohibited mail because it lists a non-institutional return address.  Doc. #1, Exh. A at 50.

25  However, the prison officials explained that the information in the letter originated from another

26  institution but was not mailed directly from that institution.  <u>Id.</u> at 54, 56.  Again, defendants do

27  not provide the court with a copy of the Gonzalez letter or details about how the information

28

United States District Court
For the Northern District of California

1   originated from the other institution.  Although the confiscation is intended to keep the letter and

2   its contents from Harrison, defendants could file under seal copies of the confiscated mails or

3   a description of the mail.  Defendants have chosen to do neither.

4        Although the Court owes substantial deference to prison administrators' professional

5   judgment, defendants have the burden of demonstrating the absence of a genuine issue of

6   material fact.  Celotex, 477 U.S. at 323.  Conclusory statements do not suffice to meet their

7   burden.  Based on the record before the Court, defendants have not met their burden and a

8   factual dispute remains as to whether the Gonzalez letter originated from another institution.

9

10        iii.   Prohibition Against Mail That Directs Revenue Generating Activity.

11  Harrison does not challenge the reasonableness of the prohibition against mail that directs

12  revenue generating activity.  Cal. Code Regs., Title 15, Section 3024(b).  He acknowledges that

13  the event referenced in the Bastienne letter is a fundraiser, but argues that contributions to

14  NARN, a non-profit, do not constitute revenue generation.  Section 3024 is titled "Business

15  Dealings by Inmates."  Section 3024(a) defines a business as "any revenue generating or profit

16  making activity."  Id. at § 3024(a).  The regulation does not distinguish between whether the

17  revenue serves a for-profit or non-profit purpose.

18        The Court would defer to prison officials' judgment that NARN is a BGF-related entity,

19  and that therefore any contributions to NARN constitute revenue.  See, e.g., Overton, 539 U.S.

20  at 132.  However, the record is unclear as to the nature of the event discussed in Bastienne's

21  letter.  Although Harrison states that the event is a NARN fundraiser, Bastienne claims that the

22  fundraiser was intended to raise funds to purchase Harrison's annual care package.  Viewing the

23  facts in the light most favorable to Harrison, the Court finds that there is a question of fact as to

24  whether the Bastienne letter directs revenue gathering.  See, e.g., T.W. Elec. Serv., 809 F.2d at

25  630.

26        With respect to Harrison's incoming mail, the Court finds that the mail stopped on March

27  19, 2008, was properly confiscated for promoting gang activity.  The Court finds that there is

28

15

United States District Court
For the Northern District of California

1   insufficient evidence to find that the mails stopped on April 9, 2008, and July 14, 2008,

2   promoted gang activity.  The Court further finds that there is insufficient evidence to determine

3   whether the Gonzalez letter stopped on July 14, 2008, constituted illegal inmate-to-inmate

4   correspondence from another institution and whether the Bastienne letter stopped on July 14,

5   2008, illegally directed revenue-generating activity.

7   2.    Outgoing Mail

8        A.    Background

9        Harrison argues that defendants violated his First Amendment rights when they

10  confiscated the following four pieces of outgoing mail:[3]

11        (1)    On March 1, 2007, Harrison's outgoing mail addressed to Kansas Mutual

12  Aid/Allied Resistance was confiscated by Officer Milligan and ISU Captain McGuyer because

13  it allegedly contained BGF-related material.  The content of the mailing was a political article

14  authored by Harrison, titled "On the Move, One Forward Motion, Can't Stop!! Won't Stop!!"

15        The essay discusses a "phase of resistance" that took place in the 1960s and 1970s and

16  refers to

17        numerous new Afrikan freedom fighters/prisoners of war who are wrongfully being held
      on lockdown in these gulags.  In some instances, some have been in this position for the
18     past 3 to 4 consecutive decades.  And on the other hand, we've had several of our fellow
      New Afrikan black brothas/sistas take a step back from the struggle and begin identifying
19     themselves as "ex" & "former" members of whatever previously existing social/political
      organization . . .
20
21  Doc. #1, Exh. A at 4.  The essay concludes by quoting "comrade" George Jackson: "Do what

22  must be done; discovery your humanity and your love in revolution.  Pass on the torch.  Join us,

23  give up your life for the people."  Id. at 6.

24        Harrison appealed the confiscation, arguing that because George Jackson was not a BGF

25  _____

26        [3]The court's ability to evaluate the merits of this case is hampered by the fact that defendants
    have only provided the court with a copy of the outgoing mail confiscated on March 12, 2009.  Doc.
27  #14, Exh. B.  Harrison has provided the court with what he claims is the outgoing mail stopped on
    March 1, 2007.  Doc. #15, Exh. E.  Outside of these two exhibits, the court must rely on the parties'
    description of the other pieces of outgoing mail to do its analysis.

28

United States District Court
For the Northern District of California

1   member, his essay did not reference any type of criminal or violent activity, and that its

2   confiscation was contrary to a decided case in Del Norte County.  Id. at 4.  In the second level

3   review, PBSP Warden Horel denied Harrison's appeal, finding that the mail promoted gang

4   activity.  Horel specifically identified portions of the letter which indirectly referenced BGF and

5   BGF members at PBSP, concluding that "[t]he quotes from George Jackson, when taken in

6   context with these additional statements, which allude to the struggles of the BGF, make for a

7   letter which promotes the ideology of the BGF."  Id. at 7.    Horel found that the Del Norte

8   County court case had no bearing on the confiscated mail issue; that case did not address mail

9   which incorporated George Jackson quotes in a context that promoted gang activity.  Id. at 8.

10          Harrison appealed again and received a director level review.  The director found that

11   Harrison's allegations had been reviewed and properly evaluated by the administrative staff, and

12   denied his appeal.  Id. at 9.

13          (2)    On February 17, 2009, Harrison's outgoing mail addressed to Anthony

14   Rayson was confiscated by Officer Milligan and Captain Brandon because it allegedly contained

15   BGF related material.  The content of the mailing was a pamphlet authored by Harrison titled

16   "New Afrikan Anti-Alcohol Initiative 101" that discussed "the social chemical addiction of

17   'alcohol abuse' that exists within the New Afrikan Black community. . ."  Id. at 61.

18          Harrison appealed the confiscation, arguing that the pamphlet did not contain BGF-related

19   material.  Id. at 59.  Harrison's appeal went directly to a second level review by PBSP Warden

20   Francisco Jacquez.  Jacquez determined that the mail contained information related to BGF

21   activity and denied Harrison's appeal:

> The envelope contained information referencing the New Afrikan Revolutionary
> Nationalist, which has been determined to be an attempt to disguise the activities of the
> BGF.  The letter references publishing the information contained in the letter on an
> internet website.  Review of the website specifically names historical BGF figures in the
> mission statement for "The Struggle Continues" authored by Harrison and posted on the
> internet.  Based upon these references, the information is related to prison gang activity,
> which is precluded by regulations and, therefore, not protected speech.

26   Id. at 68.

27          Harrison appealed again and received a director level review.  Harrison again argued that

28

17

United States District Court
For the Northern District of California

the New Afrikan Revolutionary Nationalism was not a BGF reference. He further argued that the members of the Black Liberation Movement listed on his webpage were not BGF members. Id. at 69. In response, the director noted that Captain Brandon had informed the appeals examiner that

> CDCR considers the Black Panthers as a disruptive group and that the "New Afrikan" terminology is used by the BGF members. The appeals examiner notes that the appellant uses this language within this appeal. The appeals examiner also previously spoke to M. Ruff, Special Agent in Charge, Office of Correctional Safety, and was advised that any literature or photographs with George Jackson is considered to be gang related, and ties to the BGF, and should be banned.

Id. at 70. The director found that Harrison's allegations had been reviewed and properly evaluated by the administrative staff, and denied his appeal.

(3)     On March 12, 2009, two pieces of Harrison's outgoing mail, both addressed to Anthony Rayson, were confiscated by Officer Milligan and Captain Brandon because they allegedly promoted BGF related material. The content of the mailings was a Harrison-authored essay entitled "The New Afrikan Community Response Network." Id. at 75, 80; Doc #14, Exh. B. Harrison claimed that the essay did not discuss BGF-related activity; rather it "address[ed] the matter of prisoner 'mail censorship.'" Doc. #1, Exh. A at 75. In his essay, Harrison proposed an organization that would protect prisoners' First Amendment rights. Harrison envisioned that the organization would receive financial donations and conduct fundraisers to fund its work. Id. at 80-85.

Harrison appealed the confiscation, arguing that Officer Milligan falsely and incorrectly equated all writings regarding "New Afrikan" with promoting BGF-related activity. Id. at 75. Harrison's appeal went directly to a second level review by Warden Jacquez. Jacquez conducted a detailed investigation and analysis of Harrison's essay, Rayson's background, and the related internet website where Harrison wished to publish his proposal. Id. at 80-85.

Jacquez found that Anthony Rayson was "a self-admitted anarchist" and affiliated with the Anarchist Black Cross. Id. at 82. The Anarchist Black Cross is described as an "anarchist political Prison Abolition organization . . . [which] openly supports those who have committed

18

crimes in furtherance of revolutionary aims that anarchists accept as legitimate." Id.  On its website, the Anarchist Black Cross states that there is "a real need for Anarchists to be militantly organized."  It also refers to its members as "terrorists."  Id. at 83.  The Warden also noted that "New Afrikans" is not a title accepted in mainstream society and derives from the 1968 revolutionary organization, Republic of New Afrika, which has had violent confrontations with law enforcement.  Id.  "Members of the BGF refers to themselves as 'New Afrikans.'"  Id.  Rayson's organization has previously published gang-related materials for BGF members at PBSP-SHU.  Id. at 85.

Based upon this detailed review, Jacquez concluded that Harrison's mailing was a promotion of gang activity:

> The nature of setting up this organization through Rayson is consistent with the BGF's method of operation, specifically relying on the work of people in the community to type, display, and distribute the material under the direction and control of BGF members.

> [Harrison's political views were] not considered when evaluating the reasonableness of the disapproved correspondence in light of the articulated security concerns. [His writings] raise concern that there is a threat to legitimate penological interests when Harrison includes multiple sponsorship of his proposal, advocates the control of people in the community to work under the direction of him and his unnamed assistants, identifies unauthorized revenue generating activity to fund his proposed sub-organization, and sends his material to an individual who promotes anarchy and claims allegiance to a group that "*openly supports those who have committed crimes in furtherance of revolutionary aims that anarchists accept as legitimate*" and advocate [sic] being "*militantly organized.*"

Id. (quotations and emphasis in original).

Harrison appealed again and received a director level review.  The director denied his appeal, finding that Harrison's mail was "properly considered contraband based upon the gang activity included within the letter."  Id. at 86.


B.     Analysis

Confiscation of outgoing mail must further an important or substantial governmental interest unrelated to the suppression of expression.  Procunier, 416 U.S. at 413.

> One of the primary functions of government is the preservation of societal order through enforcement of the criminal law, and the maintenance of penal institutions is an essential

United States District Court
For the Northern District of California

19

United States District Court
For the Northern District of California

part of this task. The identifiable governmental interests at stake in this task are the preservation of internal order and discipline, the maintenance of institutional security against escape or unauthorized entry, and the rehabilitation of the prisoners.

Id. at 412. Once the government interest allegedly being protected by the limitation on outgoing mail is identified, then one must consider whether the limitation is no greater than necessary to protect that interest. A tighter fit between governmental interest and the limitation imposed is required for outgoing mail than incoming mail, because by its nature outgoing mail generally has less serious implications on prison security and internal order than incoming mail. See Thornburgh, 490 U.S. at 411-13.

Prison officials may not censor inmate correspondence simply to eliminate unflattering or unwelcome opinions or factually inaccurate statements. Procunier, 416 U.S. at 413. In Procunier, the appellate court upheld the lower court's decision that invalidated several regulations regarding outgoing mail, specifically, regulations that allowed "censorship of statements that 'unduly complain' or 'magnify grievances,' expression of 'inflammatory political, racial, religious or other views,' and matter deemed 'defamatory' or 'otherwise inappropriate.'" Id. at 415. The Court determined that the prison officials "failed to show that these broad restrictions on prisoner mail were in any way necessary to the furtherance of a governmental interest unrelated to the suppression of expression." Id. With respect to the regulation allowing censorship of inflammatory views, the Court rejected prison officials' contention that such "matter clearly presents a danger to prison security," noting that the regulation was "not narrowly drawn to reach only material that might be thought to encourage violence . . ." Id.

Defendants have the burden to prove that the confiscation furthered an important government interest and to prove that the confiscation of materials was no greater than necessary to protect that interest. Id. at 413; cf. Beard, 548 U.S. at 530-34 (putting burden on the state to show penological interest, and connection between the limitation and the penological objective when Turner, 482 U.S. 78, applies); Armstrong v. Davis, 275 F.3d 849, 874 (9th Cir. 2001) ("To

United States District Court
For the Northern District of California

1   satisfy <u>Turner</u>, the Board must, at the very least, adduce some penological reason for its policy

2   at the relevant stage of the judicial proceedings."). However, prison administrators are not

3   "required to show with certainty that the adverse consequences would flow from the failure to

4   censor a particular letter. Some latitude in anticipating the probable consequences of allowing

5   certain speech in a prison environment is essential the proper discharge of an administrator's

6   duty." <u>Procunier</u>, 416 U.S. at 414.

7       Prison officials confiscated Harrison's above outgoing mail on the ground that it

8   promoted gang activity in violation of 15 Cal. Code Regs. §§ 3136(a), 3023(a). Prison officials

9   argue that this restriction on Harrison's outgoing mail is necessary to ensure prison security,

10  which is acknowledged to be an important governmental interest. <u>Id.</u> at 412.

11      Prison officials have demonstrated a tight fit between each piece of confiscated outgoing

12  mail and prison security, and that the limitation is no greater than necessary to ensure prison

13  security. In reviewing each piece of mail, prison officials found that George Jackson and the

14  NARN were invoked in a context that promoted gang activity. The mail stopped on March 1,

15  2007, quoted George Jackson and indirectly referenced the BGF and BGF members at PBSP.

16  The mail stopped on February 17, 2009, contained information referencing NARN, which has

17  been determined by prison officials to disguise the activities of the BGF. In addition, the mail

18  was addressed to Anthony Rayson, who has previously published gang-related materials for

19  BGF members housed at PBSP-SHU. Rayson is also affiliated with the Anarchist Black Cross,

20  a organization which advocates being "militantly organized" and seeks abolition of prisons.

21  Similarly, the mail confiscated on March 12, 2009, also contained information regarding NARN

22  and was addressed to Rayson. Finally, prison officials point out that Harrison is seeking to

23  publish his writings through Rayson and his affiliated publishing company, which is consistent

24  with BGF's known method of operation: publishing materials through "people in the community

25  . . . under the direction and control of BGF members." <u>Id.</u> at 85.

26      Defendants have not confiscated Harrison's mail because of the references to NARN or

27  George Jackson; rather they have carefully reviewed his mail and the relevant context to ensure

28

that the confiscation was necessary to ensure prison security.  See, e.g., Procunier, 416 U.S. at 415 (disapproving regulation which not "narrowly drawn to reach only material that might be thought to encourage violence).  Defendants have proven that the confiscation of Harrison's outgoing mail furthered the important government interest of ensuring prison security.

3.   Qualified Immunity

The defense of qualified immunity protects "government officials . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  The Court must consider the following two questions: (1) "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" and (2) whether the right was clearly established. . . .  'The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.' . . . The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  Saucier v. Katz, 533 U.S. 194, 201-02 (2001) (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)); Pearson v. Callahan, 555 U.S. 223, 235 (2009) (overruling the sequence of the Saucier two-part test that required determination of a deprivation first and then whether such right was clearly established, as required by Saucier).

Prison officials' confiscation of Harrison's outgoing mail and the incoming mail stopped on March 19, 2008, did not violate Harrison's First Amendment rights.  Therefore, the Court need not consider whether the right was clearly established.  Accordingly, defendants are entitled to judgment as a matter of law on the qualified immunity defense with respect to Harrison's incoming mail stopped on March 19, 2008 and with respect to Harrison's outgoing mail.

The record is unclear as to whether the confiscation of Harrison's incoming mail stopped on April 9, 2008, and July 14, 2008, violated Harrison's First Amendment.  Therefore, the Court

does not address the qualified immunity issue with respect to these pieces of mail.

4.     <u>Request for Judicial Notice</u>

Harrison has also submitted a request for judicial notice, requesting that the Court consider his opposition brief despite exceeding the page limits and that the Court consider defendants' responses to his request for admission. Doc. #16.  In denying in part and granting in part defendants' summary judgment motion, the Court has considered the entire record, including Harrison's opposition brief.  Harrison's request for judicial notice is DENIED AS MOOT.

**REFERRAL FOR SETTLEMENT CONFERENCE**

The Northern District of California has established a Pro Se Prisoner Settlement Program. Certain prisoner civil rights cases may be referred to a neutral magistrate judge for prisoner settlement proceedings.  The present case will be REFERRED to Magistrate Judge Vadas for settlement proceedings to address Harrison's First Amendment claims with respect to the incoming mails stopped on April 9, 2008, and July 14, 2008.

The proceedings will consist of one or more conferences as determined by Magistrate Judge Vadas.  The conferences may be conducted at Pelican Bay State Prison, where Plaintiff is housed and defendants and/or their representative shall attend in person, or may contact Magistrate Judge Vadas to seek permission to attend by videoconferencing, if available, or by telephone.

The conference shall take place within <u>one hundred twenty (120) days</u> after the date of this Order.  Magistrate Judge Vadas shall coordinate a time and date for the conference with all interested parties and/or their representatives and, within <u>ten (10) days</u> after the conclusion of the conference, file with the Court a report regarding the conference.

The Clerk of the Court shall provide a copy of this Order, and copies of documents from the court file that are not accessible electronically, to Magistrate Judge Vadas.

**CONCLUSION**

For the foregoing reasons, defendants' motion for summary judgment (Doc. #14) is GRANTED IN PART AND DENIED IN PART.  The case is referred to the Pro Se Prisoner Settlement Program to address Harrison's First Amendment claims with respect to the incoming mails stopped on April 9, 2008, and July 14, 2008.  The Clerk shall terminate all pending motions as decided by this order.


IT IS SO ORDERED.

Dated: September 21, 2011                                   _____
                                                                            SUSAN ILLSTON
                                                                     United States District Judge